IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION
_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) No. 19-cr-20229-JTF-tmp |
| | ) |
| DEREK DAVENPORT, | ) |
| | ) |
|     Defendant. | ) |

_____

## REPORT AND RECOMMENDATION

_____

Before the court by order of reference is defendant Derek Davenport's Motion to Suppress, filed on June 29, 2020. (ECF Nos. 47, 52.) The government responded to the motion on July 27, 2020, and filed a supplemental response on September 16, 2020. (ECF Nos. 56, 61.) For the reasons below, it is recommended that the Motion to Suppress be denied.

## I.  PROPOSED FINDINGS OF FACT

The following proposed findings of fact are based on the evidence presented at the September 16, 2020 suppression hearing, including the testimony of Memphis Police Department ("MPD") Sergeant Jonathan Overly, MPD Detectives Chauncey Owens, Brian Scott, and Benjamin Locke, and the testimony of Davenport's ex-girlfriend, Antionette Tennial. To the extent the officers' testimony conflicts with the testimony of Tennial, the undersigned

finds the testimony of the officers to be more credible than Tennial's.

At around 7:30 a.m. on April 10, 2019, several officers from the MPD went to a house located at 578 Leacrest Avenue in Memphis, Tennessee, to execute an arrest warrant they had for Derek Davenport. Even though Davenport did not live at this residence, the officers suspected that he would be found there because a car registered in his name had been seen parked outside. Antionette Tennial, Davenport's ex-girlfriend and the mother of his two daughters, lived at the Leacrest residence along with several family members.[1] Davenport had arrived at the house earlier that morning to take his daughter to school.

Upon arriving at the house, Sergeant Jonathan Overly and Detective Josh Myers walked up to the front door and knocked, announcing their presence. Nobody answered for several minutes. The officers could hear a commotion coming from inside the house. They could also smell the faint odor of marijuana emanating from inside the house. Eventually, Tennial opened the door. Sergeant Overly introduced himself to her, told her that he was looking for Davenport, and asked if he could speak with him. Tennial confirmed

---

[1]At the time, Tennial's mother owned the house, where two of Tennial's brothers, her sister-in-law, and her uncle also lived. None of them were present at the house the morning of April 10, 2019.

that Davenport was in the house, at which point the officers walked inside. Once inside, the marijuana odor became more apparent.

From the entrance way, Sergeant Overly drew his gun and called out for Davenport. He saw Davenport poke his head out of a bedroom door, wearing only a t-shirt and underwear. He was holding a young child. Sergeant Overly, with his gun still drawn, told Davenport that he was under arrest and placed him in handcuffs. The detectives then escorted Davenport outside the house and placed him in the back of a police car. Davenport told the officers he did not live at the Leacrest residence and he could not give them consent to search it. He instead directed them to Tennial for consent to search.

Back inside, Sergeant Overly spoke briefly with Tennial about the smell of marijuana in the house. She told him that she had recently smoked marijuana, but that there was no marijuana in the house. She asked him why the officers were there, to which Sergeant Overly explained that they had an arrest warrant for Davenport. He asked her if the officers could search the house because of the marijuana odor. Sergeant Overly testified that she did not respond. At that point, Sergeant Overly directed Detectives Owens and Atkins to continue the conversation with her about consent while he went outside to the police car. Because Davenport was taken to the car wearing only his underwear, Tennial asked if she could find a pair of pants for him to wear. When she was unable to quickly find the

pants that he had worn over that morning, she grabbed a different pair of pants that was rolled up in a box instead.

Shortly thereafter, Tennial gave Detective Owens verbal consent to search the residence. He gave her a consent to search form to sign, read it to her, and told her that she could revoke her consent at any time during the search.[2] Detectives Owens and Myers witnessed Tennial sign her name at both the top and the bottom of the form. The consent form reads:

> I, Antionette Tennial, having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize Det. Owens, Sgt. Overly, and Det. Atkins, Scott, Myers, [and] Locke of Memphis Police Department to conduct a complete search of my premises located at 578 Leacrest Ave.
>
> This written permission is being given by me to the above named persons voluntarily and without threats or promises of any kind. /s/ Antionette Tennial.

(ECF No. 56-1.)

Detective Owens allowed Tennial to follow him and the other officers around the house as they conducted their search. The officers found several guns, drugs, and thousands of dollars in cash. The officers also found a single pair of red men's pants in the bedroom closet. After the search was conducted, the officers asked Tennial to sign a Miranda rights waiver form, again informing

---

[2] Tennial testified that she works as a nursing assistant and has completed two-plus years of college education.

her that she was not obligated to sign it and that she could later invoke her rights should she choose to do so.[3] She signed the form and gave a written statement.

A federal grand jury returned a six-count indictment against Davenport on August 29, 2019, charging him with one count of possession of less than fifty kilograms of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1), one count of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), two counts of possession of a firearm in connection with drug trafficking in violation of 18 U.S.C. § 924(c), one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1), and one count of possession of a firearm by a person previously convicted of a domestic violence misdemeanor in violation of 18 U.S.C. § 922(g)(9). (ECF Nos. 1-2.)

## II.    PROPOSED CONCLUSIONS OF LAW

### A.    Reasonable Expectation of Privacy

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their

---

[3]Tennial testified that the officers never asked for her consent to search the house, that she repeatedly told them they did not have permission to conduct a search, and that while she eventually signed the consent form, she did so only because the officers had their guns drawn and they threatened to contact Child Protective Services to take her children away. The undersigned finds her testimony to be not credible.

persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. The Sixth Circuit has recognized that, "[b]ecause Fourth Amendment rights are 'personal,' . . . the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized."[4] United States v. King, 227 F.3d 732, 743 (6th Cir. 2000) (quoting Rakas v. Illinois, 439 U.S. 128, 140 (1978) and citing Katz v. United States, 389 U.S. 347, 353 (1967)); United States v. Adams, 583 F.3d 457, 463 (6th Cir. 2009); United States v. Waller, 426 F.3d 838, 843 (6th Cir. 2005); United States v. McCaleb-Pippens, No. 3:09-CR-64, 2010 WL 2927412, at *7 (E.D. Tenn. May 24, 2010). "Whether a legitimate expectation of privacy exists in a particular place or thing is determined on a 'case-by-case basis'" and involves a two-part inquiry by the court. Adams, 583 F.3d at 463 (quoting King, 227 F.3d at 744). "First, we ask whether the individual . . . has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private. . . . Second, we inquire

---

[4]Although this concept is colloquially referred to in the case law as standing, "it should not be confused with Article III standing." Byrd v. United States, 138 S. Ct. 1518, 1531 (2018) ("The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing.")

whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." Id. (internal quotations omitted).

"A person may acquire a reasonable expectation of privacy in property in which he has neither ownership nor any other legal interest." United States v. Washington, 573 F.3d 279, 283 n.1 (6th Cir. 2009) (citing Minnesota v. Olson, 495 U.S. 91, 96–97 (1990)). This is derived from Supreme Court jurisprudence establishing that a person's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." Olson, 495 U.S. at 96–97. "In certain cases, this circuit has even extended standing to challenge a search to non-overnight guests who are permitted to keep items in the residence." Washington, 573 F.3d at 283; see, e.g., Waller, 426 F.3d at 844 (holding that a person who was not an overnight guest but who showered and kept personal belongings at a friend's apartment could challenge the search of his luggage bag in the apartment where he "left the bag zipped, closed, and stored in the bedroom closet of the apartment" and "show[ed] by his conduct that he sought to preserve the contents of his luggage bag as private"); United States v. Pollard, 215 F.3d 643, 647-48 (6th Cir. 2000) (holding that a defendant who had recently slept overnight at another's home, kept personal belongings in a closet in the living room, and was allowed to stay in the home when the

residents were not present could assert a Fourth Amendment challenge to a search); <u>United States v. Freeman</u>, No. 14-cr-20315-SHM-tmp, 2015 WL 5315690, at *4 (W.D. Tenn. Sept. 4, 2015) (recognizing a reasonable expectation of privacy for a defendant who never slept overnight at the house but babysat at the house every day, kept clothing at the house, and was allowed to enter and exit through the garage door at his leisure). In determining whether a defendant has a legitimate expectation of privacy in the home of another, courts have considered several factors, including:

> [W]hether the defendant lived or was an overnight guest in a dwelling, how often and for how long the defendant stayed in the dwelling, whether the defendant maintained personal belongings in the residence, whether the defendant provided any sort of remuneration for the privilege of staying there, whether the defendant could come and go freely, the defendant's relationship to the host, and whether the Defendant had the right to exclude others or evidence manifesting an intent to exercise this right.

<u>United States v. Shelton</u>, 384 F. Supp. 3d 916, 923-24 (M.D. Tenn. 2019) (citations omitted).

Davenport did not live at the Leacrest residence and he had not slept at the house the night before the search. Rather, he had arrived at the house earlier that morning to pick up his daughter for school. Other than the pair of red pants that was found in the house (which Davenport apparently wore when he came over that morning), there was no evidence that he kept his clothes or any

other belongings at the residence.[5] In fact, Tennial testified that he was not regularly around her home and that her relationship with Davenport ended long before April 10, 2019. There was no evidence that Davenport had the freedom to come and go from the house. Cf. Pollard, 215 F.3d at 647-48; Freeman, 2015 WL 5315690, at *4. The undersigned submits that Davenport did not have a reasonable expectation of privacy in the Leacrest home and thus cannot challenge the search on Fourth Amendment grounds.

**B.    Consent to Search**

Even assuming, *arguendo*, that Davenport had a reasonable expectation of privacy in the Leacrest residence, the search was otherwise valid because the officers obtained Tennial's consent to conduct their search. Warrantless searches are "'per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.'" Arizona v. Gant, 556 U.S. 332, 338 (2009) (quoting Katz, 389 U.S. at 357). One such established exception is that warrantless searches of a dwelling may be conducted "with the voluntary consent of an individual possessing authority." Georgia v. Randolph, 547 U.S. 103, 109 (2006); see also Florida v. Jimeno, 500 U.S. 248, 250-51 (1991) ("[I]t is no doubt reasonable for the police to conduct a

---

[5]The fact that Tennial found a different pair of pants for Davenport to wear is of little consequence. Tennial never testified that the pants she brought out belonged to Davenport, and at least three other adult men lived at the residence.

search once they have been permitted to do so."). Once given, "[i]t is well-settled that 'the consenting party . . . at any moment may retract his consent.'" United States v. Buckingham, 433 F.3d 508, 513 (6th Cir. 2006) (quoting Painter v. Robertson, 185 F.3d 557, 567 (6th Cir. 1999).

Such consent must be voluntary and freely given. United States v. Moon, 513 F.3d 527, 537 (6th Cir. 2008) (citing Bumper v. North Carolina, 391 U.S. 543, 548 (1968)). "Consent is voluntary when it is 'unequivocal, specific and intelligently given, uncontaminated by any duress or coercion.'" Id. (quoting United States v. McCaleb, 552 F.2d 717, 721 (6th Cir. 1977)). "The government is required to show something more than 'mere acquiescence' on the part of the defendant." United States v. Holland, 522 F. App'x 265, 274 (6th Cir. 2013) (quoting United States v. Canipe, 569 F.3d 597, 603 (6th Cir. 2009)). "'[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.'" Moon, 513 F.3d at 537 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)). Relevant circumstances include the age, intelligence, and education of the individual, whether the individual understood that she had the right to refuse consent, the use of coercive conduct by police, and whether the individual knew her constitutional rights. United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999); see also

United States v. Frost, 521 F. App'x 484, 488-89 (6th Cir. 2013);
United States v. Ables, 280 F. App'x 513, 516-17 (6th Cir. 2008).
Police officers are not required to tell defendants that they have
a right to decline giving consent, but doing so is further evidence
that consent was voluntarily given. United States v. Gossett, 600
F. App'x 330, 335 (6th Cir. 2015). "The burden of proving that a
search was voluntary is on the government . . . and 'must be proved
by clear and positive testimony.'" Moon, 513 F.3d at 537 (quoting
United States v. Scott, 578 F.2d 1186, 1188-89 (6th Cir. 1978)).
"The government's showing must satisfy the preponderance
standard." Holland, 522 F. App'x at 274 (citing Worley, 193 F.3d
at 385).

Based on the credible testimony of the officers, the
undersigned finds that Tennial gave the officers consent to search
her residence and that she never revoked her consent. Four officers
testified that Tennial gave consent for them to search the house.
In addition to her verbal consent, the officers presented Tennial
with a written consent to search form, which she signed. Before
she signed the form, an officer read it to her, told her she was
not obligated to sign it, and told her that she could revoke her
consent at any time. See Gossett, 600 F. App'x at 335 (consent
voluntary where officers told the defendant's mother that she could
revoke her consent at any time). The officers did not engage in
coercive conduct to obtain Tennial's consent, and allowed her to

walk with them as they conducted their search. Tennial's two-plus years of college education and employment as a nursing assistant further demonstrate that her consent was knowing and voluntary. See Worley, 193 F.3d at 386 (considering a defendant's "age, intelligence and education" in determining if he gave valid consent to search). The undersigned submits that, based on the totality of the circumstances, Tennial intelligently and voluntarily consented to the search of the Leacrest residence.

### III. RECOMMENDATION

For the above reasons, it is recommended that Davenport's Motion to Suppress be denied.

Respectfully submitted,


s/ Tu M. Pham_____
TU M. PHAM
Chief United States Magistrate Judge

October 29, 2020_____
Date


### NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**